IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

STACY HOVAN,

*Plaintiff-Appellant,*

— v. —

METROPOLITAN LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## BRIEF FOR PLAINTIFF-APPELLANT

GREGORY M. DELL
JEREL C. DAWSON
ALEXANDER A. PALAMARA
ATTORNEYS DELL
   & SCHAEFER CHARTERED
2625 Weston Road
Weston, Florida 33331
(954) 620-8300

*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 11th Cir. R. 26.1-1, Appellant certifies that the following individuals and entities have an interest in the outcome of this appeal:

Attorneys Dell & Schaefer, Chartered

Jerel C. Dawson

Gregory M. Dell

Alexander A. Palamara

Stacy Hovan

Hon. Jose E. Martinez (District Court Judge)

Metropolitan Life Insurance Company

Maynard Nexsen, PC

Jeannine C. Jacobson

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant respectfully requests oral argument, as this appeal involves significant issues with respect to disability benefits determinations pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The Appellant contends that, for reasons explained in the "Argument and Citations of Authority" section of this Brief, the Appellee's disposition of the Appellant's claim for disability benefits and the district court's affirmance of that disposition were contrary to important federal policies underlying ERISA. The Appellant therefore respectfully submits that oral argument would assist this Court's adjudication of the appeal.

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................. C1 of 1

STATEMENT REGARDING ORAL ARGUMENT ........................... i

TABLE OF AUTHORITIES ................................................... iv

STATEMENT OF JURISDICTION ............................................ 1

STATEMENT OF THE ISSUES ............................................... 1

STATEMENT OF THE CASE ................................................. 2

    Course of Proceedings and Disposition Below ........................... 2

    Statement of the Facts .................................................... 2

    Standard of Review ..................................................... 11

SUMMARY OF THE ARGUMENT ......................................... 11

ARGUMENT AND CITATIONS OF AUTHORITY ........................ 12

    I.   The Benefits Termination Decision Was "*De Novo* Wrong." ....... 16

    II.  The Benefits Termination Decision Was Arbitrary and Capricious ........................................................... 24

        A. Dr. Ghebrendrias Ignored the Central Disability Question ..... 28

        B. Dr. Ghebrendrias' Review was Selective, Incomplete, and Biased ............................................................ 30

        C. MetLife's Conflict of Interest Influenced the Company's Decision ........................................................... 32

    III. The Appropriate Remedy is Retroactive Reinstatement of Benefits ........................................................... 35

CONCLUSION .............................................................. 36

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*,
    833 F.3d 1299 (11th Cir. 2016)............................................... 14

*Applicants v. Tex. State Bd. of Bar Examiners*,
    No. A-93-CA-740, 1994 WL 923404 (W.D. Tex., Oct. 11, 1994) ...... 18

*Bailey v. Comm'r of Soc. Sec.*,
    623 F. Supp.2d 889 (W.D. Mich. 2009) ................................... 30

*Bauer v. Astrue*,
    532 F.3d 606 (7th Cir. 2008) ........................................ 18, 25

*Black & Decker Disab. Plan v. Nord*,
    538 U.S. 822, 123 S.Ct. 1965 (2003) ..................................... 12

*Blajei v. Sedgwick Claims Mgt. Servs.*, Inc.,
    721 F. Supp.2d 584 (E.D. Mich. 2010) .................................. 32

*Blankenship v. Metro. Life Ins. Co.*,
    644 F.3d 1350 (11th Cir. 2011)...................................... 15, 24

*Blue Cross & Blue Shield of Ala. v. Sanders*,
    138 F.3d 1347 (11th Cir. 1998)........................................... 13

*Bowen v. Astrue*,
    No. 2:09-cv-39, 2010 WL 2653458 (E.D. Mo., June 29, 2010) .... 20, 21

*Boysen v. Illinois Tool Works Inc. Sep. Pay Plan*,
    767 F. App'x 799 (11th Cir. 2019)....................................... 33

*Capone v. Aetna Life Ins. Co.*,
    592 F.3d 1189 (11th Cir. 2010)........................................... 13

*Doyle v. Liberty Life Assur. Co. of Boston*,
    542 F.3d 1352 (11th Cir. 2008) ......................................... 15

*Fitts v. Unum Life Ins. Co. of Am.*,
    No. 98-617, 2007 WL 1334974 (D.D.C., May 7, 2007) ................. 18

iv

*Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*,
  41 F.3d 1476 (11th Cir. 1995) ................................................ 22

*Gable v. Sweetheart Cup Co.*,
  35 F.3d 851 (4th Cir. 1994) ................................................ 23

*Gleason v. Colvin*,
  152 F. Supp.3d 364 (M.D. Pa. 2015) ................................ 21

*Haisley v. Sedgwick Claims Mgt. Servs., Inc.*,
  776 F. Supp.2d 33 (W.D. Pa. 2011) ................................ 26

*Hauser v. Life Gen. Sec. Ins. Co.*,
  56 F.3d 1330 (11th Cir. 1995) ................................ 14

*Hayden v. Martin Marietta Materials, Inc. Flex. Ben. Program*,
  763 F.3d 598 (6th Cir. 2014) ................................ 28, 29

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
  571 U.S. 99, 134 S.Ct. 604 (2013) ................................ 22

*Helms v. Monsanto Co., Inc.*,
  728 F.2d 1416 (11th Cir. 1984) ................................ 18

*Henglein v. Colt Indus. Operating Corp.*,
  260 F.3d 201 (3d Cir. 2001) ................................ 22

*Herman v. Hartford Life and Acc. Ins. Co.*,
  508 F. App'x 923 (11th Cir. 2013) ................................ 15, 16

*Howard v. Hartford Life and Acc. Ins. Co.*,
  563 F. App'x 658 (11th Cir. 2014) ................................ 24

*Hudson v. Delta Air Lines, Inc.*,
  90 F.3d 451 (11th Cir. 1996) ................................ 22

*Javery v. Lucent Tech., Inc. LTD Plan*,
  741 F.3d 686 (6th Cir. 2014) ................................ 26

*Jelinek v. Astrue*,
  662 F.3d 805 (7th Cir. 2011) ................................ 18

*Johnson Controls, Inc. v. Flaherty*,
  408 F. App'x 312 (11th Cir. 2011) ................................ 22

*Kaviani v. Reliance Standard Life Ins. Co.*,
   373 F. Supp.3d 1337 (M.D. Fla. 2019), *aff'd*, 799 F. App'x 753
   (11th Cir. 2020) ....................................................... 30, 31

*Lewis v. Colvin*,
   No. 14-cv-50195, 2016 WL 4530338 (N.D. Ill., Aug. 30, 2016)........ 25

*McDonough v. Aetna Life Ins. Co.*,
   783 F.3d 374 (1st Cir. 2015).................................. 16, 17, 29, 30

*Miller v. Am. Airlines, Inc.*,
   632 F.3d 837 (3d Cir. 2011) ........................................ 16, 35

*Mirocha v. Metro. Life Ins. Co.*,
   56 F. Supp.3d 925 (N.D. Ill. 2014) ..................................... 32

*Moorman v. UnumProvident Corp.*,
   464 F.3d 1260 (11th Cir. 2006).......................................... 13

*Morris v. Crow*,
   117 F.3d 449 (11th Cir. 1997)........................................... 11

*Newsom v. Reliance Standard Life Ins. Co.*,
   26 F.4th 329 (5th Cir. 2022) ........................................... 13

*Paese v. Hartford Life and Acc. Ins. Co.*,
   449 F.3d 435 (2d Cir. 2006) ............................................ 15

*Ruiz v. Continental Cas. Co.*,
   400 F.3d 986 (7th Cir. 2005) ........................................... 23

*Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Plan*,
   85 F.3d 455 (9th Cir. 1996)............................................. 22

*Samuels v. Acting Com'r of Social Security*,
   959 F.3d 1042 (11th Cir. 2020).......................................... 25

*Shaw v. AT&T Umbrella Ben. Plan No. 1*,
   795 F.3d 538 (6th Cir. 2015) ........................................... 35

*Sheehan v. Metro. Life Ins. Co.*,
   368 F. Supp.2d 228 (S.D.N.Y. 2005) ..................................... 26

*Smith v. Cox Enterprises, Inc.*,
   81 F. Supp.3d 1366 (N.D. Ga. 2015) ..................................... 15

*Temu v. Holder*,
740 F.3d 887 (4th Cir. 2014) ............................................. 18

*U.S. Airways, Inc. v. McCutchen*,
569 U.S. 88, 133 S.Ct. 1537 (2013)...................................... 22

*U.S. v. Garcia*,
855 F.3d 615 (4th Cir. 2018) ............................................. 17

*U.S. v. Watkins*,
10 F.4th 1179 (11th Cir. 2021) .......................................... 15

*Wenner v. Sun Life Assur. Co. of Canada*,
482 F.3d 878 (6th Cir. 2007) ............................................. 35

*Williams v. BellSouth Telecom., Inc.*,
373 F.3d 1132 (11th Cir. 2004)........................................... 14

*Wilson v. Walgreen Income Prot. Plan for Pharmacists and
Registered Nurses*,
942 F. Supp.2d 1213 (M.D. Fla. 2013) .................................. 31

*Winkler v. Metro. Life Ins. Co.*,
170 F. App'x 167 (2d Cir. 2006).......................................... 26

**Statutes**

28 U.S.C. § 1291 ............................................................. 1

28 U.S.C. § 1331 ............................................................. 1

29 U.S.C. § 1001 *et seq.*, Employee Retirement Income Security Act
of 1974 ("ERISA") ...................................................*passim*

29 U.S.C. § 1132(a)(1)(B).................................................. 1, 13

**Other Authorities**

*Bipolar disorder*, National Institute of Mental Health,
www.nihm.nih.gov/health/topics/bipolar-disorder (visited on
April 29, 2023)............................................................ 17

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction because Plaintiff/Appellant, as a participant in an employee welfare benefit plan, brought suit to recover plan benefits pursuant to § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The cause of action was created by federal law, and, therefore, federal question jurisdiction existed pursuant to 28 U.S.C. § 1331. After the district court entered summary judgment in favor of Defendant/Appellee, the Plaintiff/Appellant timely filed his Notice of Appeal in the district court. This appeal is from a final judgment that disposed of all parties' claims, and, therefore, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the district court erred in entering summary judgment in favor of the Appellee on the Appellant's claim for long-term disability ("LTD") benefits.

Whether the district court erred in denying the Appellant's motion for summary judgment on her claim for LTD benefits.

Whether the district court erred in affirming the denial of the Appellant's claim for LTD benefits.

Whether the district court impermissibly imposed new conditions on Plaintiff/Appellant's eligibility for LTD benefits that were not stated in the Policy.

## STATEMENT OF THE CASE

Plaintiff/Appellant, Stacy Hovan ("Hovan"), appeals the district court's disposition of the parties' cross-motions for summary judgment under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Hovan, as she did in the district court action, seeks judicial reversal of the decision of Defendant/Appellee, Metropolitan Life Insurance Company ("MetLife"), as a claim administrator for an employee benefit plan, to terminate long-term disability ("LTD") benefits.

### Course of Proceedings and Disposition Below

Hovan brought suit in the district court on June 29, 2022, seeking reversal of MetLife's benefits termination decision. (DE 1.) The parties filed cross-motions for summary judgment (DE 26, 29) on May 10, 2023. The district court adjudicated the cross-motions on March 22, 2024 (DE 54), denying Hovan's motion, granting MetLife's motion, and affirming the benefits decision.

### Statement of the Facts

Hovan, as an employee of the law firm of Troutman Sanders LLP ("Troutman Sanders"), had LTD coverage under an employee welfare benefit plan sponsored by Troutman Sanders (the "Plan"). (DE 1, pg. 2, ¶¶ 6-8; DE 8, pg. 2, ¶¶ 6-8.) The coverage was provided through a group insurance policy (the "Policy") issued to

Troutman Sanders by MetLife, which acted as claim administrator for the Plan. (DE 1, pg. 2, ¶ 9; DE 8, pg. 2, ¶ 9; DE 22-1, pg. 3-64.)

The Plan provides MetLife with discretionary authority to determine eligibility for benefits. (DE 22-1, pg. 59.)

Under the Policy, MetLife is obligated to pay benefits to a covered employee who becomes Disabled, as defined in the Policy, and remains so throughout and beyond the 90-day elimination period. (DE 22-1, pg. 21-23, 35.) The Policy defines "Disability" as a claimant's inability, due to sickness or injury, to perform the material duties of his or her "Own Occupation." (*Id.*, pg. 23.) With respect to attorneys, the Policy defines "Own Occupation" to mean "the specialty in the practice of law in which You were engaged just prior to the date Disability started." (*Id.*, pg. 25.)

The Policy states that payments will cease when the claimant is "no longer Disabled" or fails to "provide required Proof of continuing Disability." (DE 22-1, pg. 41.) "Proof" is defined in relevant part as "[w]ritten evidence" that the claimant "has satisfied the conditions and requirements" for the benefits claimed. (*Id.*, pg. 26.) The Policy further states that "Proof" must establish (a) the "nature and extent of the loss or condition," (b) MetLife's "obligation to pay the claim," and (c) the claimant's "right to receive payment." (*Id.*)

The Policy states that following MetLife's initial approval of an LTD claim, MetLife is entitled to have the claimant independently examined to "verify that You continue to be Disabled." (DE 22-1, pg. 35.) Benefits for a disability arising from a mental disorder are limited to a maximum total of 24 months. (*Id.*, pg. 45.)

Prior to becoming disabled, Hovan was employed by Troutman Sanders as a commercial litigation attorney, with a practice that included complex business litigation, class actions, intellectual property disputes, and commercial arbitration proceedings. (DE 22-3, pg. 285.)

Hovan ceased work as of February 25, 2019 due to her diagnosed condition of bipolar disorder, the symptoms of which included depression, crying spells, mania, mood dysregulation, anxiety, racing thoughts, impulsivity, panic attacks, inability to concentrate, and inability to control emotions. (DE 22-1, pg. 67, 131, 185, 191-192.)

After claiming disability, Hovan advised MetLife that she (a) had constant crying spells, (b) was "easily overwhelmed" by work assignments, (c) had "inaccurate judgment" and could not make appropriate decisions, and (d) required supervision at work when she was expected to be "self-reliant." (DE 22-1, pg. 202-203.) Hovan's LTD claim was supported by an Attending Physician Statement dated April 23, 2019, from psychiatrist Michael Lara, M.D. (DE 22-3, pg. 344-346) Identifying a primary diagnosis of bipolar disorder, Dr. Lara advised that Hovan

suffered from "impaired judgment" and "poor decision making" as well as mood swings and racing thoughts. (*Id.*, pg. 344-345.) Dr. Lara further noted that Hovan was "able to engage in only limited stress situations and … limited interpersonal relations." (*Id.*, pg. 345.)

On June 6, 2019, Hovan was admitted to a mental health Intensive Outpatient Treatment program at Mills Health Center in San Mateo, California, pursuant to referral by treating providers. (DE 22-2, pg. 165.) As stated in the admission note, Hovan had recently experienced a "manic episode" during which she "bought an RV" and "planned to quit her job, and … travel around the country." (*Id.*, pg. 167.) Hovan was noted to have a history of two suicide attempts. (*Id.*) Following an examination of Hovan, psychiatrist Milada Urban, M.D. certified that "partial hospitalization and/or outpatient services are medically necessary" due to Hovan's symptoms of mania, occupational dysfunction, social isolation, and socially inappropriate behaviors. (*Id.*, pg. 168.) Hovan proceeded to take part in the Intensive Outpatient Program until July 24, 2019. (*Id.*, pg. 169-216.)

Hovan's LTD claim was reviewed for MetLife by LTD Claims Specialist Michael Workman, who entered an "Initial Claim Decision" into MetLife's computerized claim-notes system on September 9, 2019. (*Id.*) Mr. Workman observed that Hovan's occupation as a litigation attorney had required her to "**focus and concentrate, make appropriate decisions using critical thinking skills, solve**

**complex problems, interact appropriately with clients, coworkers, and judges, multitask, and be able to handle [her] workload**." (*Id.*, pg. 203) (emphasis added). Based on Hovan's symptoms as reported by her and her treating providers, Mr. Workman concluded that her "psychiatric clinical impairments" would prevent her from performing her occupational responsibilities. (*Id.*) Hovan's LTD claim was thus approved by MetLife, with benefits commencing as of June 1, 2019. (*Id.*, pg. 204-205; DE 22-3, pg. 159-160.)

In June 2020, after MetLife complained of being unable to obtain treatment notes from a treating psychiatrist who maintained sparse records, Hovan's counsel advised MetLife that Hovan would "gladly present herself" for an independent medical examination if MetLife wished to verify her current psychiatric condition. (DE 22-1, pg. 352-353.)

From September 22, 2020, until October 16, 2020, Hovan was admitted to a partial hospitalization program at PeakView Behavioral Health ("PeakView"), a psychiatric facility in Colorado Springs, Colorado. (DE 22-1, pg. 633.) While at PeakView, Hovan described herself as tending to be "calm one minute and angry and crying the next." (*Id.*, pg. 639.) She stated that she would frequently lose her temper and then start "wishing she were dead." (*Id.*) Hovan also described visual hallucinations in the form of a "matrix of light" that sometimes "makes patterns, like a face." (*Id.*, pg. 640.)

Hovan's discharge summary from PeakView, dated October 16, 2020, was completed and signed by psychiatrist Sohail Punjwani, M.D.[1] (DE 22-1, pg. 633-641.) Dr. Punjwani listed diagnoses of bipolar disorder, generalized anxiety disorder, and post-traumatic stress disorder, with symptoms of "Anger, depression, anxiety, visual hallucinations, intrusive thoughts, avoidance, impulsivity, startle response, [and] hyper-vigilance." (*Id.*, pg. 633, 639.) Hovan was noted to have tried "many" mental health medications in the past, including but not limited to Abilify, Seroquel, Lithium, Lamictal, Lexapro, Depakote, Klonopin, Prozac, Remeron, and Wellbutrin. (*Id.*, pg. 639.)

Dr. Punjwani also completed a "Behavioral Health Supplemental Assessment Form" furnished by MetLife. (DE 22-1, pg. 630-632.) Advising that he had reviewed Hovan's job description, Dr. Punjwani opined that Hovan could *not* "perform the same job" either in another department of the same company or for a different company during the time of her treatment. (*Id.*, pg. 631) (underscoring in original). Dr. Punjwani further stated that Hovan's mental impairment "significantly affects [her] ability to function." (*Id.*)

In November of 2020, Hovan began treating with therapist Sherrie Stevens, LCSW. (DE 22-1, pg. 611.) On November 18, 2020, Hovan advised Ms. Stevens

---

[1]    As seen below, this was the date on which MetLife would later deem Hovan capable of full-time work in her occupation. *See* pg. 8, *infra*.

that she "struggles with functioning" and "wishes that she had never been created." (*Id.*, pg. 612.) Hovan further advised that she "struggles with depressed mood daily" and that her "suffering is overwhelming." (*Id.*)

On December 14, 2020, Ms. Stevens noted that Hovan had recently been "really high and really low" emotionally. (DE 22-1, pg. 642.) Hovan advised Ms. Stevens that she had "spiraled down into a dark place" and had experienced suicidal ideation the previous night. (*Id.*)

On January 13, 2021, Hovan informed Ms. Stevens that she had "healed from depression" and was now considering "packing up her RV and going south" for what Hovan called a "vision quest." (DE 22-1, pg. 607.)

In a therapy session on January 20, 2021, Hovan described "feelings of mania" and episodes of "irritability related to being manic." (DE 22-1, pg. 590.) Ms. Stevens listed active symptoms of anxious mood, depressed mood, and mania. (*Id.*, pg. 591.)

In correspondence dated January 27, 2021, MetLife notified Hovan of the decision to terminate benefits effective October 16, 2020, *i.e.*, the date of her discharge from PeakView. (DE 22-1, pg. 580-582.) In explaining the decision, MetLife emphasized that some of therapist Stevens' notes described Hovan as being "alert and oriented, affect appropriate, mood depressed, interactive and functional status intact." (*Id.*, pg. 580.) The company further stated that there were "no indicators of psychiatric severity that would warrant psychiatric restrictions, such as

active suicidality or homicidality with active intent, plan and lethality, recent suicide attempts, florid psychosis, cognitive impairment, or impaired thought process or content." (*Id.*) MetLife did not discuss the occupational duties or mental demands of Hovan's occupation as a litigation attorney; instead, the company merely referred to her job as physically "sedentary." (*Id.*)

On February 3, 2021, therapist Stevens noted that Hovan was in an "elevated mood" and was displaying signs of "mania." (DE 22-1, pg. 599.) One week later, Ms. Stevens described Hovan as "agitated." (*Id.*, pg. 598.)

On February 17, 2021, Ms. Stevens again described Hovan as being in an "elevated" mood that was indicative of "mania." (DE 22-1, pg. 588-589.) Hovan was noted to be taking prescription ketamine, an anesthetic medication sometimes prescribed as an antidepressant. (*Id.*, pg. 588.)

In a session with Ms. Stevens on March 3, 2021, Hovan was "cycling more with mania." (DE 22-1, pg. 605.) Hovan was noted not to be taking any medications, as she did not "feel a need" for any. (*Id.*) Ms. Stevens listed "mania" as an active symptom. (*Id.*, pg. 606.)

Hovan, through counsel, appealed the benefits termination decision in correspondence dated July 30, 2021. (DE 22-1, pg. 550-578.) Hovan invited MetLife to have an "appropriate doctor meet with and evaluate" her to determine her eligibility for continuing benefits. (*Id.*, pg. 558.)

In a letter dated August 10, 2021, MetLife advised Hovan's counsel that while the Policy allowed MetLife to arrange an independent examination, it did not "require MetLife to do so." (DE 22-1, pg. 661.)

Rather than have Hovan examined in person by a mental health professional, MetLife commissioned a medical file review by consulting psychiatrist Sarah Ghebrendrias, M.D., whose report was dated August 13, 2021. (DE 22-1, pg. 539-544.) Without ever seeing or speaking with Hovan, Dr. Ghebrendrias opined that Hovan was capable of working on a "full-time basis" after October 16, 2020. (*Id.*, pg. 543.) In explaining this conclusion, the reviewer advised that there was no evidence of "psychomotor agitation, psychosis, delusions, hallucinations, lack of motivation, loss of appetite, homicidality, suicidality (intent or plan), self-destructive behaviors, or involuntary hospitalization due to a psychiatric emergency." (*Id.*) Dr. Ghebrendrias further advised that Hovan's treatment records made "no mention of impairment in insight and judgment." (*Id.*) Dr. Ghebrendrias' report did not cite or discuss the duties or demands of Hovan's occupation as a commercial litigation attorney. (*Id.*, pg. 539-544.)

In correspondence dated August 27, 2021, MetLife notified Hovan of the decision to uphold on appeal the termination of benefits, based largely on Dr. Ghebrendrias' file-review report. (DE 22-1, pg. 514-517.) Although MetLife noted that Hovan's law practice included responsibility for "complex litigation, class

actions … intellectual property disputes and commercial arbitration cases" (*id.* at 514), the company's letter did not mention any of the mental demands of her occupation; nor did it explain how she was capable of meeting such demands. (*Id.*, pg. 514-517.)

## Standard of Review

This Court reviews summary judgment rulings *de novo*, using the same legal standards applicable in the district court action. *Morris v. Crow*, 117 F.3d 449, 455 (11th Cir. 1997). In the present case, the district court conducted a *de novo* review of the challenged benefits termination decision.

## SUMMARY OF THE ARGUMENT

This appeal tests whether an insurance company administering an ERISA-governed disability plan may disregard its own policy's provisions in order to discontinue benefits under an own-occupation definition of disability. A preponderance of the evidence demonstrates that the ongoing, active symptoms of Hovan's bipolar disorder precluded her from performing on a full-time basis the exacting duties of her occupation as a commercial litigation attorney. Hovan's mental health treatment records document that she experienced one or more disabling symptoms, including but not limited to active mania, at all relevant times. MetLife in concluding otherwise neglected even to assess Hovan's ability to perform her actual job duties in view of her symptoms, even though applicable law and the

terms of the Policy required MetLife to conduct that very inquiry. The company instead improperly relied on a deeply flawed file-review report from a psychiatrist who never considered Hovan's occupational requirements or her ability to satisfy them. This Court should accordingly determine that MetLife's decision was "*de novo* wrong."

The same file-reviewer repeatedly omitted or downplayed the symptoms described in Hovan's treatment records, which reflect swings between severe depression and active mania. MetLife's unquestioning reliance on her selective report is thus evidence of a decision that was arbitrary and capricious as well as incorrect. MetLife's failure to consider Hovan's ability to perform her occupational duties was likewise arbitrary and capricious, and evidences the effect of MetLife's financial self-interest on the company's decision-making. Finally, it was arbitrary and capricious for MetLife to condition benefits on the opinion of a treating provider the company made only a minimal effort to contact while simultaneously refusing Hovan's offers to undergo an independent medical examination.

## <u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disab. Plan v. Nord*, 538 U.S. 822, 830, 123 S.Ct. 1965 (2003) (citation omitted). For all purposes relevant to this appeal, an ERISA-

governed benefit plan is a program established or maintained by an employer in order to provide disability benefits to employees. *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1269 (11th Cir. 2006).

In a typical benefit plan arrangement, the employer contracts with an insurance company to serve as the "claim administrator" for the plan, with the insurer making claim decisions and paying benefits to eligible plan participants under the terms of a group disability policy issued by the insurer. *See, e.g., Newsom v. Reliance Standard Life Ins. Co.*, 26 F.4th 329, 331 (5th Cir. 2022) (noting that insurer "issued the policies that funded these [disability] benefits and served as the benefits claims administrator"). When claim administrators have "authority to make ultimate decisions regarding benefits eligibility," as MetLife did here, they are "fiduciaries" under ERISA. *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1352 n.4 (11th Cir. 1998). As such, they must discharge their duties "solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199 (11th Cir. 2010) (citing 29 U.S.C. § 1104(a)(1)).

ERISA authorizes plan participants and beneficiaries to bring civil actions for judicial review of adverse benefits decisions by claim administrators. 29 U.S.C. § 1132(a)(1)(B). Because the statute does not include a body of contract law to

regulate such actions, disputes over plan benefits are generally governed by "federal common law." *Hauser v. Life Gen. Sec. Ins. Co.*, 56 F.3d 1330, 1333 (11th Cir. 1995).

Under federal common law, a district court's decision to affirm or reverse an ERISA claim administrator's denial of benefits is reviewed *de novo*, with this Court "applying the same legal standards that governed the district court's disposition." *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1306 (11th Cir. 2016).

In *Williams v. BellSouth Telecom., Inc.*, 373 F.3d 1132 (11th Cir. 2004), this Court established an analytical framework for district courts to use in "judicially reviewing virtually *all* ERISA benefit-plan denials." *Id.* at 1137 (emphasis in original). The current controlling version of the *Williams* analysis, as modified in subsequent Eleventh Circuit decisions, requires a district court to proceed as follows:

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether reasonable grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (setting forth "the present *Williams* test").

In the court's initial *de novo* review, the plaintiff bears the burden of demonstrating by a preponderance of the evidence that he or she is disabled.[2] *Paese v. Hartford Life and Acc. Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Smith v. Cox Enterprises, Inc.*, 81 F. Supp.3d 1366, 1379 (N.D. Ga. 2015). If the court reaches the third *Williams* step, the plaintiff then has the burden of demonstrating that the administrator's decision was "arbitrary and capricious" as well as wrong. *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1360 (11th Cir. 2008).

Notably, the Federal Rules of Evidence do not apply in an ERISA benefits case. *Herman v. Hartford Life and Acc. Ins. Co.*, 508 F. App'x 923, 928 (11th Cir.

---

[2]     A "preponderance of the evidence" means evidence that is "more convincing than the evidence offered in opposition to it." *U.S. v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) (citations omitted).

2013). The Court accordingly considers all evidence, including hearsay evidence, that was available to the claim administrator. *Id.*

## I. The Benefits Termination Decision Was "*De Novo* Wrong."

As the Third Circuit has aptly observed, any "rational decision to terminate disability benefits under an own-occupation plan" must necessarily address whether the claimant "can actually perform the specific job requirements" of his or her occupation. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855 (3d Cir. 2011). Medical evidence, in other words, is "only part of the equation." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381 (1st Cir. 2015). To conduct a reasoned assessment of the claimant's ability to work in their own occupation, the decision-maker "*must be aware of, and apply, the requirements of the occupation.*" *Id.* (emphasis added).

MetLife ignored this policy requirement, terminating benefits as of the day Hovan was discharged from the hospital. As recounted above, MetLife gave no consideration to the duties or demands of Hovan's occupation as a commercial litigation attorney, let alone assess her ability to perform those duties and meet those demands. *See* pg. 8-11, *supra*. In making its final decision on appeal, MetLife relied on the opinion of a medical file-reviewer who likewise gave no consideration to the duties or demands of the occupation. *See* pg. 10, *supra*. The district court then stated in conclusory fashion that Hovan had failed to meet her burden of showing that she was "unable to perform each of the material duties of her own occupation." (DE 54,

pg. 15.) But, while some of Hovan's occupational responsibilities are mentioned else in the district court's order, the district court offered no analysis of any such responsibilities or how she would be able to perform them. (*Id.*, pg. 3, 14-15.)

Hovan respectfully urges this Court, in its *de novo* review of the claim, to do what MetLife and the district court each declined to do -- namely, compare the available information regarding her bipolar symptoms to the demands of her occupation as a commercial litigation attorney, as the Policy and the law require. When the necessary analysis is undertaken, her disability at all relevant times is established by a preponderance of the evidence, meaning the termination decision was "*de novo* wrong."

Bipolar disorder, formerly known as manic-depressive disorder, is a "mental illness that causes unusual shifts in a person's mood, energy, activity levels, and concentration." *Bipolar disorder*, National Institute of Mental Health, www.nihm.nih.gov/health/topics/bipolar-disorder (visited on April 29, 2023).[3] These shifts "can make it difficult to carry out day-to-day tasks." *Id*. A person with bipolar disorder "has violent mood swings, the extremes of which are mania -- a

---

[3]     A federal court of appeals can take judicial notice of publicly available information found on government websites. *See, e.g., U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2018) (collecting cases and commenting that "[t]his court and numerous others routinely take judicial notice of information contained on state and federal government websites."). Hovan therefore respectfully requests that the Court take judicial notice of the cited information from the National Institute of Mental Health website.

state of high excitement in which he loses contact with reality and exhibits bizarre behavior -- and clinical depression, in which he has great difficulty sleeping or concentrating, has suicidal thoughts and may actually attempt suicide." *Bauer v. Astrue*, 532 F.3d 606, 607 (7th Cir. 2008).[4] The "majority" of bipolar patients experience "chronic interpersonal or occupational difficulties between acute episodes." *Fitts v. Unum Life Ins. Co. of. Am.*, No. 98-617, 2007 WL 1334974, *2 (D.D.C., May 7, 2007) (citing DSM-IV, at 386). Consequently, as one would expect, bipolar disorder is among the "serious mental illnesses" that can "affect a person's ability to practice law." *Applicants v. Tex. State Bd. of Bar Examiners*, No. A-93-CA-740, 1994 WL 923404, *3 (W.D. Tex., Oct. 11, 1994).

There is, as courts have recognized, "no cure" for bipolar disorder. *Temu v. Holder*, 740 F.3d 887, 896 (4th Cir. 2014). Although the disease is managed with various medications, many people who have it "do not respond well to treatment." *Bauer*, 532 F.3d at 607 (citing medical journal article). For "many patients," the "prognosis of bipolar disorder is not good," as the disease is "associated with frequent relapses and recurrences." *Id.* Because bipolar disorder is "episodic in nature," the disease is characterized by "regular fluctuations even under proper treatment." *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

---

[4]  While *Bauer* is a Social Security disability case rather than an ERISA case, courts applying ERISA have long "turned for guidance … to cases construing the Social Security disability provisions." *Helms v. Monsanto Co., Inc.*, 728 F.2d 1416, 1420 (11th Cir. 1984).

The record of the instant case reflects that in November 2020, treating therapist Sherrie Stevens noted that Hovan "struggles with functioning" and "wishes that she had never been created." (DE 22-1, pg. 612.) Hovan further advised Ms. Stevens that she "struggles with depressed mood daily" and that the "suffering is overwhelming." (*Id.*) In December 2020, Ms. Stevens noted that Hovan had recently been "really high and really low" emotionally. (*Id.*, pg. 642.) Hovan advised Ms. Stevens that she had "spiraled down into a dark place" and experienced suicidal ideation the previous night. (*Id.*)

On January 13, 2021, however, Hovan informed Ms. Stevens that she had "healed from depression" and was now considering "packing up her RV and going south" for what Hovan called a "vision quest." (DE 22-1, pg. 607.) In a therapy session on January 20, 2021, Hovan described "feelings of mania" and episodes of "irritability related to being manic." (*Id.*, pg. 590.) Ms. Stevens listed active symptoms of anxious mood, depressed mood, and mania. (*Id.*, pg. 591.) On February 3, 2021, therapist Stevens noted that Hovan was in an "elevated mood" and was displaying signs of "mania." (*Id.*, pg. 599.) One week later, Ms. Stevens described Hovan as "agitated." (*Id.*, pg. 598.) On February 17, 2021, Ms. Stevens again described Hovan as being in an "elevated" mood that was indicative of "mania." (*Id.*, pg. 588-589.) In a session with Ms. Stevens on March 3, 2021, Hovan was "cycling more with mania." (DE 22-1, pg. 605.) Hovan was noted not to be taking any

medications, as she did not "feel a need" for any. (*Id.*) Ms. Stevens listed "mania" as an active symptom, as she did repeatedly in various treatment notes. (*Id.*, pg. 589, 591, 600, 606.)

Mania is characterized by, among other things, "distractibility" and "poor judgment." *Bowen v. Astrue*, No. 2:09-cv-39, 2010 WL 2653458, *6 n.13 (E.D. Mo., June 29, 2010) (citing <u>Stedman's Medical Dictionary</u>). As MetLife has previously acknowledged, Hovan's occupation as a commercial litigation attorney required her to continuously "focus and concentrate," and also to "make appropriate decisions." (DE 22-1, pg. 203.) It is, Hovan respectfully contends, self-evident that her symptoms of active mania -- such as distractibility and impaired judgment -- limited her ability to perform an occupation requiring sustained focus, intense concentration, and appropriate decision-making. Hovan was, moreover, required to exercise those abilities on behalf of clients to whom she herself owed both fiduciary duties and professional duties of competent representation.

This Court is respectfully urged to consider the position of a litigation client, with much at stake in a complex commercial dispute, placing its trust in the judgment of a bipolar attorney who is -- in the words of Hovan's therapist -- "cycling more with mania." (DE 22-1, pg. 605.) Indeed, at that time, Hovan's judgment was so poor that she did not "feel a need" to take any medication, notwithstanding her incurable condition and her ongoing symptoms. (*Id.*) Such severely impaired

judgment is a "hallmark of bipolar disorder," as that disease will often "deprive a [person] of the rationality to decide whether to continue treatment or medication." *Gleason v. Colvin*, 152 F. Supp.3d 364, 391 (M.D. Pa. 2015) (citations omitted). This lack of rationality was further reflected in Hovan's declaration to her therapist that she had "healed from depression" and was now contemplating a "vision quest." (DE 22-1, pg. 607.) MetLife's determination of Hovan's fitness to work in an occupation requiring her to make "appropriate decisions" by using "critical thinking skills" (*id.*, pg. 203) was thus manifestly erroneous.

At no point in the proceeding below did either MetLife or the district court endeavor to explain how Hovan -- cycling with mania and irrationally perceiving no need for medication -- could have reliably protected the interests of clients in complex commercial litigation disputes. Because litigants necessarily depend on the sound judgment and sober advice of their attorneys, she plainly could not have done so, thus entitling her to continued benefits.

In deeming the evidence insufficient to support Hovan's claim, the district court emphasized that treating therapist Stevens "never opined as to [Hovan's] ability to return to work." (DE 54, pg. 14.) But the Policy does not require a treating provider's opinion to be submitted as a condition of benefits, and neither MetLife nor the district court was empowered to impose any such purported requirement.

ERISA's "principal function" is to protect "contractually defined benefits." *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100, 133 S.Ct. 1537 (2013) (citation omitted). Employee benefit plans are therefore required to be "governed by written plan documents." *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) (citation omitted). *See also Heimeshoff v. Hartford Life & Acc. Ins. Co*., 571 U.S. 99, 108, 134 S.Ct. 604 (2013) (noting that ERISA's "focus on the written plan" is the "linchpin" of the statute). Once a plan is established, the administrator "must act in accordance with the documents … governing the plan." *McCutchen*, 569 U.S. at 101 (citation omitted). When the terms of an ERISA plan document are clear and unambiguous, courts are required to "enforce them as written." *Johnson Controls, Inc. v. Flaherty*, 408 F. App'x 312, 313 (11th Cir. 2011). Consequently, as this Court has made clear, an ERISA administrator is not permitted to impose "new requirements" for benefits that are not stated in the plan. *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995). *Accord Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Plan*, 85 F.3d 455, 459-60 (9th Cir. 1996) (citing *Florence Nightingale* and holding that an administrator cannot "rewrite the plan" in a manner that "effectively imposes a new requirement" for disability benefits). Federal courts are similarly "not at liberty to rewrite the terms of an ERISA plan." *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 215 (3d Cir. 2001).

Where, as here, ERISA-regulated benefits are provided through an insurance policy, the policy is a plan document. *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 991 (7th Cir. 2005); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 856 (4th Cir. 1994). The Policy states that payments will cease when the claimant is "no longer Disabled" or fails to "provide required Proof of continuing Disability." (DE 22-1, pg. 41.) The Policy defines "Disability," in pertinent part, as the claimant's inability, due to sickness or injury, to perform the material duties of his or her own occupation. (*Id.*, pg. 23.) "Proof" is defined in relevant part as "[w]ritten evidence" that the claimant "has satisfied the conditions and requirements" for the benefits claimed. (*Id.*, pg. 26.) The Policy further states that "Proof" must establish (a) the "nature and extent of the loss or condition," (b) MetLife's "obligation to pay the claim," and (c) the claimant's "right to receive payment." (*Id.*) Notably absent from these governing Policy provisions is any requirement that a treating provider must express an opinion regarding the claimant's work capacity in order for benefits to be owed to the claimant. MetLife's attempt to impose a new requirement not stated in the Policy is impermissible under ERISA.

When Hovan's symptoms and impairments are compared to the demands of her occupation, as required by law, her inability to reliably meet those demands is clear. This Court should accordingly conclude that Hovan was disabled within the meaning of the Policy, thus rendering the benefits termination decision "*de novo*

wrong." As discussed in the following section of this Brief, the decision was also arbitrary and capricious.

## II. The Benefits Termination Decision Was Arbitrary and Capricious.

An ERISA benefits decision is arbitrary and capricious if it is unsupported by reasonable grounds. *Blankenship*, 644 F.3d at 1355. In determining whether a decision was "supported reasonably by the record," a reviewing court must "take into account any conflicts of interest" that could have improperly influenced the administrator. *Howard v. Hartford Life and Acc. Ins. Co.*, 563 F. App'x 658, 663 (11th Cir. 2014) (citing *Blankenship*). MetLife is responsible for both deciding claims and paying benefits under the plan at issue here. (DE 54, pg. 2.) Because of that dual role, MetLife administered Hovan's claim under a conflict of interest as defined in ERISA law. *See Howard*, 563 F. App'x at 663 (recognizing that an ERISA administrator has a conflict of interest when it both "makes eligibility decisions and pays benefits").

As established in the preceding section of this Brief, Hovan was mentally unfit to represent clients in commercial litigation disputes at all relevant times. Furthermore, the record discloses no reasonable grounds for concluding otherwise. MetLife's initial decision to terminate Hovan's benefits effective October 16, 2020 was rendered on January 27, 2021. (DE 22-1, pg. 580-582.) In explaining the decision, MetLife emphasized that some of Hovan's psychotherapy treatment notes

during the intervening three-month period described her as "alert and oriented, affect appropriate, mood depressed, interactive and functional status intact." (*Id.*) Due to the "episodic nature of bipolar disorder," however, the Eleventh Circuit has held in the Social Security disability context that "**evidence that the claimant seemed to be doing better during certain times does not support a finding that her impairment is not severe**." *Samuels v. Acting Com'r of Social Security*, 959 F.3d 1042, 1046 (11th Cir. 2020) (emphasis added) (internal quotation marks omitted) (citing *Schink v. Com'r of Social Security*, 935 F.3d 1245, 1267 (11th Cir. 2019)). Similarly, because the symptoms of bipolar disorder "wax and wane," it is "**not a contradiction to find that a claimant has a severe and disabling mental illness and yet was behaving pretty normally during her office visits**." *Lewis v. Colvin*, No. 14-cv-50195, 2016 WL 4530338, *5 (N.D. Ill., Aug. 30, 2016) (emphasis added) (citing *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006)). MetLife's interpretation of Hovan's treatment notes as discrediting her disability claim thus "suggests a lack of understanding of bipolar disorder." *Bauer*, 532 F.3d at 609. Indeed, that lack of understanding permeated MetLife's entire claim review process, leading to an arbitrary and capricious decision.

Although ERISA law does not prohibit claim administrators from relying on medical file reviews as a general practice, courts have long recognized that "file reviews are questionable as a basis for identifying whether an individual is disabled

by mental illness." *Javery v. Lucent Tech., Inc. LTD Plan*, 741 F.3d 686, 702 (6th Cir. 2014). Unlike physical impairments, which can often be "verified or discounted solely by reference to reports of objective medical tests," *mental* impairments are properly identified "on the basis of a psychiatric professional's interactions with an impaired individual." *Haisley v. Sedgwick Claims Mgt. Servs., Inc.*, 776 F. Supp.2d 33, 50 (W.D. Pa. 2011). Indeed, the evaluation of a patient's mental condition "depends on interviewing … and spending time with the patient," which are "essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes." *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp.2d 228, 255 (S.D.N.Y. 2005). As one would expect, "first-hand observation" is thus "especially important in the context of assessing psychiatric disabilities." *Winkler v. Metro. Life Ins. Co.*, 170 F. App'x 167, 168 (2d Cir. 2006). Consequently, and for "obvious reasons," courts in ERISA disability cases often "discount the opinions of psychiatrists who have never seen the patient." *Javery*, 741 F.3d at 702 (citation omitted).

MetLife in making its final appeal decision nevertheless turned for guidance to a psychiatric file-reviewer, Dr. Ghebrendrias. *See* pg. 10, *supra*. Without ever meeting or speaking with Hovan, Dr. Ghebrendrias concluded that Hovan was capable of full-time work because there was no evidence of "psychomotor agitation, psychosis, delusions, hallucinations, lack of motivation, loss of appetite,

homicidality, suicidality (intent or plan), self-destructive behaviors, or involuntary hospitalization due to a psychiatric emergency." (DE 22-1, pg. 543.) According to Dr. Ghebrendrias, Hovan's treatment records made "no mention of impairment in insight and judgment," and her mental examinations indicated depressed and anxious mood but showed "no evidence of other abnormalities." (*Id.*) Dr. Ghebrendrias' report offered no assessment of the duties or demands of Hovan's occupation as a commercial litigation attorney. (*Id.*, pg. 539-544.)

As discussed below, MetLife's reliance on Dr. Ghebrendrias' report as the company's principal ground for terminating benefits was unreasonable. Dr. Ghebrendrias' finding that Hovan was not psychotic, homicidal, etc. was wholly irrelevant to Hovan's disability as defined in the Policy, which conditions benefits on Hovan's inability to perform her occupational duties. Because Dr. Ghebendrias simply ignored the dispositive issue, her report supplies no reasonable basis for the benefits termination decision. Furthermore, the reviewer's assertion that Hovan's treatment records failed to reflect impaired judgment or other mental abnormalities was demonstrably incorrect. Finally, MetLife's eagerness to embrace Dr. Ghebrendrias' conclusions likely was influenced by the company's financial self-interest.

A. <u>Dr. Ghebrendrias Ignored the Central Disability Question</u>.

Hovan respectfully contends that *Hayden v. Martin Marietta Materials, Inc. Flex. Ben. Program*, 763 F.3d 598 (6th Cir. 2014), is factually similar to the instant case and analytically on point. The administrator in *Hayden* relied on a file-reviewer who concluded that the plaintiff was capable of working despite her mental illness because there was no evidence of "severe psychiatric symptoms, suicidal ideation, homicidal ideation, hallucinations or cognitive impairment." *Id*. at 607. The Sixth Circuit, however, took issue with the reviewer's evident assumption that a person would have to be "suffering from severe psychiatric symptoms, suicidal ideation, homicidal ideation, [or] hallucinations to be considered disabled." *Id*. Such an assumption, the court reasoned, was "inconsistent with the terms of the Plan" because it would "effectively preclude any claimant from establishing depression or anxiety as a disability." *Id*.

Although the file-reviewer in *Hayden* opined in conclusory fashion that the claimant's symptoms would not prevent full-time work, the court pointed out that whether the claimant "could have engaged in *some* full time job was irrelevant." *Id*. (emphasis in original). What was relevant, under the terms of the plan, was specifically whether the claimant could "perform the material and substantial duties of her own occupation." *Id*. Because the administrator had relied on a file-review report that was "inadequate in critical respects," the Sixth Circuit held that the claim

denial was arbitrary and capricious. *Id.* at 609. The same result should obtain here, for the same reasons.

In the present case, similarly to *Hayden*, file-reviewer Ghebrendrias opined that Hovan was capable of working on a full-time basis after October 16, 2020. (DE 22-1, pg. 543.) Dr. Ghebendrias did not, however, say anything about what type of work Hovan was allegedly capable of doing, thus rendering the reviewer's analysis meaningless with respect to the disability question under the terms of the Policy. MetLife's reliance on the reviewer's deeply flawed report in terminating Hovan's benefits was arbitrary and capricious.

As additional persuasive authority, Hovan relies on *McDonough*, *supra* page 16, in which none of the administrator's medical reviewers "compared [plaintiff's] symptoms or impairments to any description of the physical and cognitive demands of his own occupation *as that term is defined in the plan documents*." *McDonough*, 783 F.3d at 380 (emphasis in original). Although the record contained numerous references to the plaintiff's "medical and psychological symptoms," the claim administrator "never took the obligatory step" of assessing whether and to what extent the plaintiff's impairments "compromised his ability to carry out the material duties of his own occupation." *Id*. Because the administrator had thus "sidestep[ped] the central inquiry," the First Circuit explained, the administrator's benefits decision was "**the antithesis of a reasoned determination**." *Id.* at 380-81 (emphasis added).

The appellate court therefore deemed the benefits decision arbitrary and capricious, *id.* at 382, and this Court should do likewise in the instant case.

   B.   Dr. Ghebrendrias' Review was Selective, Incomplete, and Biased.

When ERISA-governed benefits are denied based on a "flawed peer review," the denial decision is properly reversed. *Kaviani v. Reliance Standard Life Ins. Co.*, 373 F. Supp.3d 1337, 1346 (M.D. Fla. 2019), *aff'd*, 799 F. App'x 753 (11th Cir. 2020). A peer review is flawed, for example, when it reflects a "pattern of disregarding unfavorable evidence." *Id*. (citing *Oliver v. Coca-Cola Co.*, 497 F.3d 1181, 1199 (11th Cir. 2007)). That is the case here.

In a therapy session with Ms. Stevens on January 20, 2021, for example, Hovan reported "feelings of mania" and episodes of "irritability related to being manic." (DE 22-1, pg. 590.) Dr. Ghebrendrias, however, inaccurately described that treatment note as saying that Hovan was "irritable due to not getting a lot of sleep."[5] (*Id.*, pg. 541.) Although Ms. Stevens listed "mania" among Hovan's "active symptoms/impairments" (*id.*, pg. 591), Dr. Ghebrendrias' summary of the treatment note made no mention of that fact. (*Id.*, pg. 541.)

On February 3, 2021, therapist Stevens observed signs of "mania" and again listed "mania" among Hovan's "active symptoms/impairments." (DE 22-1, pg. 599-

---

[5]     "Irritability," as one would expect a psychiatrist to know, is typically associated with mania. *Bailey v. Comm'r of Soc. Sec.*, 623 F. Supp.2d 889, 894 n.13 (W.D. Mich. 2009).

600.) However, Dr. Ghebrendrias' summary of the February 3, 2021 treatment note made no mention of Hovan's mania. (*Id.*, pg. 542.)

"Mania" was once again listed as an "active symptom/impairment" in Ms. Stevens' treatment note dated February 17, 2021. (DE 22-1, pg. 589.) The February 17, 2021 treatment note was **wholly omitted from Dr. Ghebrendrias' report**.

In the concluding paragraph of her analysis, Dr. Ghebrendrias asserted that Ms. Stevens' records indicated "depressed and anxious mood" but contained "no evidence of other abnormalities." (DE 22-1, pg. 543.) The reviewer in reaching this opinion ignored Ms. Stevens' repeated references to mania, which obviously qualifies as an abnormality. Dr. Ghebrendrias' characterization of the records was simply wrong, thus further demonstrating the flawed nature of her review.

Finally, and most surprisingly, Dr. Ghebrendrias claimed that Hovan's treatment records did not evidence any "impairment in insight and judgment." (DE 22-1, pg. 543.) Hovan respectfully maintains that her failure to perceive any need for medication, even as she was cycling with mania, reflected insight and judgment that were indeed severely impaired. *See* pg. 19-20, *supra*.

Dr. Ghebrendrias' actions in repeatedly omitting or downplaying Hovan's bipolar symptoms reveal a troubling pattern of disregarding evidence favorable to Hovan's claim. MetLife's uncritical embrace of the reviewer's conclusions was thus self-serving and unreasonable. *See Wilson v. Walgreen Income Prot. Plan for*

*Pharmacists and Registered Nurses*, 942 F. Supp.2d 1213, 1251 (M.D. Fla. 2013) (ruling that a "selective review of evidence to hand pick those portions of treatment notes that support one's decision is not reasonable"); *Blajei v. Sedgwick Claims Mgt. Servs.*, Inc., 721 F. Supp.2d 584, 604 (E.D. Mich. 2010) (ruling that file-review report was an "irrational basis for denying benefits" where reviewer had "selectively cherry-picked the medical records to support his non-disability finding").

    C.  <u>MetLife's Conflict of Interest Influenced the Company's Decision</u>.

A conflicted claim administrator's "selective use of evidence" to deny benefits also suggests that the "conflict of interest influenced the decision." *Mirocha v. Metro. Life Ins. Co.*, 56 F. Supp.3d 925, 935 (N.D. Ill. 2014). The record of this case documents MetLife's consistently selective use of evidence to support a predetermined conclusion that would save the company money.

MetLife repeatedly ignored probative evidence of Hovan's disability and refused even to consider her ability to perform her occupational duties -- the very purpose of the Policy. *See* pg. 8-11, 18-31, *supra*. Tellingly, moreover, the record reflects that MetLife knows exactly how to assess a claimant's ability to perform her occupational duties when it wishes to do so. Indeed, that is how MetLife came to approve Hovan's LTD claim in the first place, with the company determining that her "psychiatric clinical impairments" would make her unable to "focus and concentrate, make appropriate decisions using critical thinking skills, solve complex

problems, interact appropriately with clients, coworkers, and judges, multitask, and be able to handle [her] workload." (DE 22-2, pg. 203). But MetLife subsequently disregarded its obligation to perform an own-occupation analysis when it decided to terminate Hovan's benefits, thus indicating that terminating benefits was the company's objective.

Finally, while MetLife seized on the lack of an opinion from Ms. Stevens as a justification for its decision, the record shows that the company barely attempted to obtain her opinion despite being legally obligated to do so. As this Court has recognized, "nothing in ERISA requires plan administrators to independently scour the countryside in search of evidence to bolster a petitioner's case." *Boysen v. Illinois Tool Works Inc. Sep. Pay Plan*, 767 F. App'x 799, 811 (11th Cir. 2019) (citation omitted). But, crucially, "neither does ERISA envision that the claims process will mirror an adversarial proceeding where the claimant bears almost all of the responsibility for compiling the record, and where the fiduciary bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." *Id*. An administrator is accordingly not permitted to "shut [its] eyes to the most evident and accessible sources of information that might support the claim." *Id*. On the contrary, an ERISA fiduciary "presented with a claim that a little more evidence may prove valid **should seek to get to the truth of the matter**." *Id.* (emphasis added) (citation omitted).

On January 13, 2021, MetLife employee Sheila Donoghue performed a "google search" to find therapist Stevens' telephone number, since no phone number was stated on Ms. Stevens' treatment notes submitted to MetLife. (DE 22-1, pg. 416-417.) After finding a number on the internet, Ms. Donoghue called that number three times, only to be greeted each time by a "rapid busy signal." (*Id.*, pg. 417.) On the following day, January 14, 2021, Ms. Donaghue made what she described as her "final attempt" to reach Ms. Stevens at the same number, again getting a busy signal. (*Id.*) Subsequently, in August 2021, the company referred Hovan's file for review by Dr. Ghebrendrias, who attempted to call Ms. Stevens at the same number. (*Id.*, pg. 540.) Dr. Ghebrendrias reported that this number was "unavailable," with the consultant thus "unable to leave a message" for Ms. Stevens. (*Id.*)

The foregoing comprises the sum total of MetLife's attempts to reach Ms. Stevens in order to solicit her opinion: a MetLife employee and the company's medical consultant each tried to call a phone number gleaned from the internet, and when that failed, they gave up. Of course, MetLife could have simply *asked Hovan* -- who presumably was able to get in touch with her therapist -- for assistance in contacting Ms. Stevens via telephone or otherwise. But MetLife made no attempt to do so. If Ms. Stevens' opinion were as important to MetLife's disability evaluation as the company would later contend, one would logically expect MetLife to have made more of an effort to reach her before rendering its final benefits determination.

That it did not is further evidence of an arbitrary and capricious decision by a conflicted fiduciary. *See Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 549 (6th Cir. 2015) (holding that the "cursory manner in which [administrator] attempted to contact [plaintiff's] treating physicians" indicated that administrator's claim decision was "not the result of a deliberate, principled reasoning process").

### III.  The Appropriate Remedy is Retroactive Reinstatement of Benefits.

When ERISA-governed disability benefits are wrongfully terminated, the appropriate judicial remedy is to "reinstate all benefits beginning from the invalid termination." *Wenner v. Sun Life Assur. Co. of Canada*, 482 F.3d 878, 883 (6th Cir. 2007). *See also Miller*, 632 F.3d at 857 (holding that wrongfully terminated LTD benefits "should be reinstated to restore the status quo"). This Court should accordingly order the reinstatement of Hovan's LTD benefits from the date of termination, thus placing Hovan "in the position [she] would have occupied but for the defendant's wrongdoing." *Wenner*, 482 F.3d at 883.

## <u>CONCLUSION</u>

**WHEREFORE**, for the above-stated reasons, this Court should reverse the judgment entered below with instructions to enter judgment in favor of Hovan for retroactive reinstatement of LTD benefits.

Dated: August 26, 2024

Respectfully submitted,

<u>*/s/* Jerel C. Dawson</u>
Alexander A. Palamara
Gregory M. Dell
Attorneys Dell & Schaefer Chartered
2625 Weston Road
Weston, Florida 33331
(954) 620-8300

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that this brief contains no more than 14,000 words. Based on the word count of the word processing system used to prepare this Brief, the word count, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), is 8,087.

I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced font that includes serifs using Microsoft Word, Times New Roman, 14 point.

By:   */s/* Jerel C. Dawson
Jerel C. Dawson

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Brief for Plaintiff-Appellant to be served on counsel for Defendant-Appellee via Electronic Mail generated by the Court's electronic filing system (CM/ECF) on this 26th day of August, 2024:

> JEANNINE C. JACOBSON
> MAYNARD NEXSEN PC
> 9100 S. Dadeland Blvd., Suite 1500
> Miami, Florida 33156
> (305) 735-3752
> jjacobson@maynardnexsen.com
> *Attorneys for Defendant-Appellee*

By:    /s/ Jerel C. Dawson
          Jerel C. Dawson