No. 24-11167

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————————

STACY HOVAN,

*Plaintiff-Appellant,*

— v. —

METROPOLITAN LIFE INSURANCE COMPANY,

*Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA IN NO. 1:22-CV-21986-JEM
(HONORABLE JOSE E. MARTINEZ, U.S. DISTRICT JUDGE)

## BRIEF FOR DEFENDANT-APPELLEE

JEANNINE C. JACOBSON
MAYNARD NEXSEN
*Attorneys for Defendant-Appellee*
9100 South Dadeland Boulevard, Suite 1500
Miami, Florida 33156
(305) 735-3750

COUNSEL PRESS    (800) 4-APPEAL • (811217)

*Hovan v. Metro. Life Ins. Co.*                                    **Appeal No. 24-11167-H**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Undersigned counsel for Metropolitan Life Insurance Company hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case:

Attorneys Dell and Schafer, Chartered, Counsel for Appellant

Dawson, Jerel C., Counsel for Appellant

Dell, Gregory M., Esq., Counsel for Appellant

Hovan, Stacy, Appellant

Jacobson, Jeannine C., Counsel for Appellee

Martinez, Jose E., District Court Judge

Maynard Nexsen, PC, Counsel for Appellee

MetLife, Inc., corporate parent of Appellee; stock ticker MET

Metropolitan Life Insurance Company, Appellee

Palamara, Alexander A., Counsel for Appellant

/s/ *Jeannine C. Jacobson*

Jeannine C. Jacobson, Esq.

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Appellee Metropolitan Life Insurance Company ("MetLife") does not request oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE ...................................................................2

Statement of Facts.................................................................................2

SUMMARY OF ARGUMENT ..............................................................10

ARGUMENT ...........................................................................................11

I. THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S RULING THAT METLIFE'S BENEFITS DETERMINATION WAS CORRECT ............................................11

    A. MetLife Appropriately Considered Hovan's Occupational Duties.................................................................11

    B. MetLife Did Not Import a "New Condition" for Eligibility into the Plan ........................................................16

II. ALTERNATIVELY, THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S RULING BECAUSE METLIFE'S BENEFITS DETERMINATION WAS NOT ARBITRARY AND CAPRICIOUS ...................................................18

    A. MetLife's Decision Was, At a Minimum, Reasonable.............18

        1. MetLife Reasonably Relied on a Medical Records Review ............................................................20

        2. The Medical Records Review Relied Upon by MetLife Was Rationally Made and Based on the Available Evidence ..................................................23

    B. MetLife's Decision Was Not Influenced By a Conflict of Interest ...................................................................26

CONCLUSION .......................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acree v. Hartford Life & Acc. Ins. Co.*,
  917 F. Supp. 2d 1296 (M.D. Ga. 2013) .............................................................30

*Applicants v. Tex. State Bd. of Bar Examiners,*
  No. A-93-CA-740, 1994 WL 923404 (W.D. Tex., Oct. 11, 1994) ....................13

*Bates v. Metro. Life Ins. Co.*,
  No. CIV.A. 5:08-CV-22CAR, 2009 WL 2355834
  (M.D. Ga. July 27, 2009) ....................................................................... 22, 23, 26

*Bauer v. Astrue,*
  532 F.3d 606 (7th Cir. 2008) .............................................................................13

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822 (2003) ...........................................................................................20

*Blankenship v. Metro. Life Ins. Co.*,
  644 F.3d 1350 (11th Cir. 2011) .................................................. 11, 18, 20, 26, 27

*Brown v. Blue Cross & Blue Shield of Ala.*,
  898 F.2d 1556 (11th Cir. 1990), *overruled on other grounds by*
  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343,
  171 L.Ed.2d 299 (2008) ......................................................................................19

*Callough v. E.I. Du Pont De Nemours & Co.*,
  941 F. Supp. 1223 (N.D. Ga. 1996) ....................................................................19

*Conkright v. Frommert*,
  559 U.S. 506 (2010) ...........................................................................................19

*Dewsnup v. Unum Life Ins. Co. of Am.,*
  No. 2:17-cv-126, 2018 WL 6478886 (D. Utah, Dec. 10, 2018) ..........................13

*Diaz v. Liberty Life Assur. Co. of Bos.*,
  No. CV 17-20662-CIV, 2017 WL 3822742 (S.D. Fla. Aug. 30, 2017) ........ 20, 21

*Doyle v. Liberty Life Assur. Co. of Bos.*,
  542 F.3d 1352 (11th Cir. 2008) ..........................................................................27

*Fitts v. Unum Life Ins. Co. of Am.*,
No. 98-617, 2007 WL1334974 (D.D.C. May 7, 2007) ....................................13

*Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*,
41 F.3d 1476 (11th Cir. 1995) ...............................................................17

*Griffis v. Delta Family-Care Disability*,
723 F.2d 822 (11th Cir. 1984) ..............................................................19

*Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*,
763 F.3d 598 (6th Cir. 2014) ................................................................26

*Howard v. Hartford Life & Acc. Ins. Co.*,
929 F. Supp. 2d 1264 (M.D. Fla. 2013), *aff'd* 563 F. App'x 658
(11th Cir. 2014).................................................................................23

*Hufford v. Harris Corp.*,
322 F. Supp. 2d 1345 (M.D. Fla. 2004)...........................................21, 24

*Island View Residential Treatment Ctr., Inc. v.*
*Bluecross Blueshield of Mass., Inc.*,
No. 07–10581–DPW, 2007 WL 4589335 (D. Mass. Dec. 28, 2007).............20-21

*Lewis v. Colvin*,
No. 14-cv-50195, 2016 WL 4530338 (N.D. Ill. Aug. 30, 2016)........................14

*Mary D. v. Anthem Blue Cross Blue Shield*,
778 F. App'x 580 (10th Cir. 2019) ........................................................21

*McDonough v. Aetna Life Ins. Co.*,
783 F.3d 374 (1st Cir. 2015).........................................................12, 16

*Metropolitan Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008).................................................................26, 27

*Miller v. Am. Airlines, Inc.*,
632 F.3d 837 (3d Cir. 2011) ...............................................................12

*Morris v. Am. Elec. Power Long-Term Disability Plan*,
399 F. App'x 978 (6th Cir. 2010) ........................................................12

*Richey v. Hartford Life and Acc. Ins. Co.*,
608 F. Supp. 2d 1306 (M.D. Fla. 2009)................................................14

iv

*Rosenthal v. LTD Plan of Epstein, Becker & Greene, P.C.,*
  No. CV-98-4246, 1999 WL 1567863 (C.D. Cal., Dec. 21, 1999)........................13

*Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Plan,*
  85 F.3d 455 (9th Cir. 1996) ...................................................................17

*Samuels v. Acting Com'r of Social Security,*
  959 F.3d 1042 (11th Cir. 2020) ............................................................14

*Shaw v. AT&T Umbrella Benefit Plan No. 1,*
  795 F.3d 538 (6th Cir. 2015) ...............................................................29

*Teicher v. Regence Health and Life Ins. Co.,*
  562 F. Supp.2d 1128 (D. Or. 2008) .....................................................13

*United States v. Osman,*
  853 F.3d 1184 (11th Cir. 2017) .............................................................6

**Other Authorities:**

*Bipolar Disorder*, National Institute of Mental Health,
  https://www.nimh.nih.gov/health/topics/bipolar-disorder,
  (visited on May 22, 2023).....................................................................14

## STATEMENT OF THE ISSUES

I.    WHETHER METLIFE'S BENEFITS DETERMINATION WAS CORRECT BASED ON THE INFORMATION BEFORE METLIFE.

II.    ALTERNATIVELY, WHETHER METLIFE'S BENEFITS DETERMINATION WAS ARBITRARY AND CAPRICIOUS BASED ON THE INFORMATION BEFORE METLIFE.

## STATEMENT OF THE CASE

MetLife agrees with Appellant's statement of the course of proceedings and disposition below and also with Appellant's statement of the appellate standard of review.

## Statement of Facts

Initially, MetLife notes that the District Court's summary of the facts, based on both parties' submissions, is accurate and not contested by either party. [DE 54 at pp. 1-10; *see generally* Initial Brief ("IB")] Reliance on the District Court's summary is important because the Statement of Facts of Appellant-Plaintiff Stacy Hovan ("Hovan") is copied, almost verbatim, from Hovan's Statement of Material Facts below with administrative record citations instead of reference to the Statement itself. [*Compare* IB at pp. 2-11 *with* DE 27] This makes it difficult to identify instances of where MetLife disputed[1] or contextualized[2] such facts, but the District Court's careful summary of the facts helps to do so.

---

[1] For example, the District Court accurately quotes from Therapist Sherrie Stevens' February 3, 2021 note where Stevens reported she "engaged [Hovan] in discussion about *possible* elevated mood" and "explored possible indications that she *may be* experiencing elevated mood (mania)." [DE 54 at p. 8 (emphases added)] Hovan omits the italicized words from her Initial Brief and incorrectly cites the latter phrase as support for Stevens *describing* Hovan as having a mood *indicative of* mania. [IB at p. 9; *see also* DE 35 at ¶¶ 25-26]

[2] Many phrases relied on by Hovan in the Initial Brief come from her self-reports, rather than a treating provider's observation, as they were included either in an initial patient intake questionnaire, in the part of the progress notes labelled "subjective" or in the "client rating of symptoms" part of the progress notes: "struggles with

Accordingly, by way of background, MetLife cites to the District Court opinion, [DE 54], as supplemented with the following facts. These additional facts are set forth in the parties' respective Statements of Material Facts and in the administrative record of Hovan's claim filed in the court below.[3]

After Hovan provided support from her then-treating psychiatrist Dr. Michael Lara that she could not work in her occupation as of February 2019, MetLife approved Hovan's disability claim. [DE 54 at pp. 3-4] In March 2020, about one month after Dr. Lara was no longer treating Hovan, MetLife sought updated medical records from Hovan since October 2019 and a behavioral health assessment form. [DE 30 at ¶¶ 16-17] MetLife obtained and/or received records evidencing Hovan's treatment with other providers who did not comment on her functionality. [*Id.* ¶ 17 Nonetheless, due to California regulations arising from the COVID-19 pandemic, Hovan's claim was not closed for lack of proof. [*Id.* ¶ 19]

In September 2020, Hovan was admitted to the PeakView partial hospitalization program ("PHP"). [DE 54 at p. 5] Ultimately, MetLife paid Hovan

---

functioning," "wishes that she had never been created," "struggles with depressed mood daily," "suffering is overwhelming," "feelings of mania today," "irritability related to being manic" after bad night of sleep, depression symptoms varying from "really high" to "really low," "spiraled down into a dark place" the night before, and "cycling with more mania." [DE 35 at ¶ 37]

[3] The administrative record (Bates numbered with an "AR" prefix) is filed at Docket Entry 22. To assist with the conversion between "AR" and "ECF" page references, MetLife provided a conversion chart in the court below. [DE 35 at p. 1]

disability benefits through the date of her discharge at PeakView (October 16, 2020); as discussed below, her benefits were terminated effective that date, meaning that she received no benefits beyond that date and that the determination at issue in this suit is whether she met the Plan definition of disability as of October 17, 2020. [*Id.* at p. 10]

On or about November 23, 2020, Hovan provided the previously requested behavioral assessment form which was completed by her treating psychiatrist at PeakView, Sohail Punjwani, M.D.. [DE 30 at ¶ 24]  Although the form was not dated, Dr. Punjwani last treated/evaluated Hovan on October 16, 2020, the day of her discharge from PeakView. [*Id.* ¶ 26]

On discharge from PeakView, Dr. Punjwani confirmed that Hovan had a good prognosis, she was stable, her condition was much improved, and she was alert, awake, and oriented to person/place/time/event; she had logical thought process, clear and goal-directed association with no evidence of a formal thought disorder, appropriate affect, euthymic mood, improved insight/judgment, good reliability, intact recent/remote memory, intact language, and normal attention/concentration. [DE 30 at ¶ 27; DE 35 at ¶ 34; DE 54 at p. 6]  Hovan herself denied suicidal ideation,

homicidal ideation, self-injurious behavior, visual hallucinations or auditory hallucinations.[4] [DE 30 at ¶ 28; DE 54 at p. 6]

Following her discharge from PeakView, Hovan also provided treatment notes from Therapist Stevens for visits approximately once per week during the period November 9, 2020 to December 21, 2020. [DE 30 at ¶ 29] Stevens' records did not recommend referral to any higher level of care or to a psychiatrist for medication management, nor did Stevens provide an opinion as to any occupational restrictions or limitations. [*Id.* ¶ 31]

Thereafter, MetLife notified Hovan of its decision to terminate benefits effective October 16, 2020, the date of her discharge from PeakView.  [DE 54 at p. 8]  MetLife advised of Hovan's right to an administrative appeal and explained that, for further consideration on appeal, Hovan would have to submit "medical documentation that supports a disability and restrictions and limitations from October 16, 2020 through the current date." [DE 30 at ¶ 34]

As explained by the District Court, the only new medical records provided on appeal were additional therapy visits with Therapist Stevens for the period January

---

[4] While Hovan had reported passive suicidal ideation (no plan, no intent) on admission to PeakView, she had not had active suicidal ideation (with a plan) since her divorce in 2015. [DE 30 at ¶ 22] She reported two prior suicide attempts in 2005, when she was first diagnosed with bipolar disorder. [*Id.*; DE 54 at p. 3]

6, 2021 to March 3, 2021, which records did not contain an opinion as to any occupational restrictions or limitations. [DE 54 at p. 9]

To review Hovan's appeal, MetLife asked its vendor (GenEx) to have Hovan's file reviewed by an independent consulting psychiatrist, and GenEx retained board-certified psychiatrist Sarah Ghebrendrias, M.D., to conduct the review and prepare a report which was dated August 13, 2021. [DE 30 at ¶ 39] In addition to reviewing the records identified in her report, Dr. Ghebrendrias left messages for multiple providers, including Drs. Lara and Punjwani as well as several therapists. [DE 30 at ¶¶ 40, 42] As noted below and in Hovan's Initial Brief, Dr. Ghebrendrias was unable to reach Therapist Stevens. [IB at p. 34] Only Dr. Lara and one therapist responded to Dr. Ghebrendrias, and both declined to participate in peer-to-peer conversations. [DE 30 at ¶ 40]

In her report, Dr. Ghebrendrias noted that she reviewed all of Therapist Stevens' records, which included a February 17, 2021 visit, but only summarized relevant notes.[5] [DE 22-1 at pp. 539-40] In Dr. Ghebrendrias's summary of those notes, she acknowledged Hovan's reports of mania. [*Id.* at pp. 542-43] Dr.

---

[5] Hovan complains that Stevens' February 17, 2021 note was not summarized in Dr. Ghebrendrias's report. [IB at p. 31] However, the subjective portion of the February 17, 2021 note indicates that the purpose of this visit was an EMDR session to process a "timeline of memories." [DE 22-1 at p. 588; *United States v. Osman*, 853 F.3d 1184, 1186 (11th Cir. 2017) (EMDR is Eye Movement Desensitization and Reprocessing therapy used for trauma).]

Ghebrendrias was aware of Hovan's diagnoses of bipolar disorder, generalized anxiety disorder, PTSD and insomnia, as well as Hovan's prior hospitalizations, suicide attempts, and chronic passive suicidal ideation without plan or intent. [DE 30 at ¶ 43] Dr. Ghebrendrias was also aware that Hovan had stopped taking the 25 mg dosage of Zoloft prescribed by Dr. Punjwani by the time she saw Therapist Stevens.[6] [DE 35 at ¶ 41]

Based on the information contained in her report, including the above, Dr. Ghebrendrias opined that: "given consideration to both the self-reported symptoms and clinical observations, the evidence does not suggest that the claimant is impaired by a mental health condition or combination of conditions of such severity to warrant the placement of restrictions or limitations on her activities for the time period of 10/17/20 and ongoing." [DE 30 at ¶ 42] Dr. Ghebrendrias explained:

> The claimant has a documented history of anxiety, manic, depressive, and post-traumatic symptoms. … Measurable exams indicated that the claimant had abnormal mood, but otherwise, her exams were normal.
>
> [T]here is no evidence of findings to suggest limitations in her status. All of the claimant's measurable exams indicated depressed and anxious mood but had no evidence of other abnormalities. The claimant reported having passive suicidal ideation but never had plan or intent. In addition, the claimant does not have any measurable evidence of psychomotor agitation, psychosis, delusions, hallucinations, lack of

---

[6] Contrary to Hovan's depiction in the Initial Brief of her Zoloft cessation as an irrational choice, the administrative record reflects that Hovan reported functioning well without medication from 2007 to early 2019 during which time she went to law school, graduated from law school, and became a single mother. [DE 35 at ¶ 32]

motivation, loss of appetite, homicidality, suicidality (intent or plan), self-destructive behaviors, or involuntary hospitalizations due to a psychiatric emergency. The claimant has not required a higher level of care for her psychiatric conditions, and there was no mention of impairment in insight and judgment. …

[DE 22-1 at pp. 542-43] Dr. Ghebrendrias further opined that Hovan's abilities were sustainable on a full time basis. [DE 30 at ¶ 45]  At the end of her report, Dr. Ghebrendrias posed the following question to Hovan's treating providers: "For Hovan, Stacy, as of 10/17/20 forward, which activity restrictions would you advocate based on observed mental health limitations?" [*Id.* ¶ 46]

Although in this suit Hovan has contended that MetLife "barely attempted" to obtain Therapist Stevens' opinion, [IB at p. 33], the administrative record details MetLife's efforts to contact Stevens.  Stevens' records contained no phone number, so MetLife did perform a Google search for Stevens' number and called it many times in January 2021, each time getting a fast busy signal. [*Id.* at p. 34]  MetLife also confirmed that the Google search number for Stevens was the same as the number for "Bridge Over Troubled Waters" (the logo on Therapist Stevens' records), so the Google search number was correct. [DE 43]  Months later, Dr. Ghebrendrias attempted contact with Stevens at the same number, which was "unavailable." [IB at p. 34]

Contrary to Hovan's contention, however, this was not the "sum total" of MetLife's attempts to reach Stevens.  [*Id.*] MetLife shared with Hovan's counsel a

8

copy of Dr. Ghebrendrias's report – which posed the question about Hovan's restrictions – and asked that additional clinical evidence be submitted if Hovan, her counsel *or her treating healthcare providers* did not agree with the findings. [DE 30 ¶ 47] Although Hovan's counsel initially sought and obtained an extension of time within which to respond to Dr. Ghebrendrias's report, Hovan's counsel later advised that MetLife could proceed with its review and did not submit any response to the report. [*Id.* ¶ 48] In other words, as the District Court correctly noted, Hovan was represented by counsel throughout her entire claim but never provided any statement of occupational restrictions or limitations by Stevens. [DE 54 at p. 10; DE 35 at ¶ 35]

## SUMMARY OF ARGUMENT

In this appeal, Hovan attempts to inappropriately shift the burden of demonstrating disability, or lack thereof, to MetLife. However, under the terms of the Plan, it was Hovan's burden to provide evidence to MetLife that her mental illness precluded her from performing her occupation, not just submit proof that she had been diagnosed with and had been treated for mental illness. Requiring Hovan to provide such evidence of the inability to perform her occupation is not importing an additional requirement into the Plan; instead, it is upholding the Plan's requirement of proof of disability. Hovan cannot now criticize MetLife for relying on the opinion of an appropriate expert who reviewed the only available treatment records, when it was Hovan who chose to submit and rely solely on restrictions and limitations provided by a psychiatrist who she once treated with, but who did not treat her after October 16, 2020. Based on the information before MetLife, MetLife's decision was correct or, at a minimum, reasonable and not impacted by a conflict of interest. Accordingly, MetLife respectfully requests that the Court affirm the entry of judgment in its favor.

## ARGUMENT

I.    THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S RULING THAT METLIFE'S BENEFITS DETERMINATION WAS CORRECT.

The District Court concluded that MetLife's benefits determination was correct based on its *de novo* review under the first step of the analysis required under *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) ("determine whether the claim administrator's benefits-denial decision is 'wrong' … if it is not, then end the inquiry and affirm the decision"). Hovan's challenges to this determination can be summarized as follows: (1) Hovan claims that MetLife did not appropriately consider Hovan's occupational duties; and (2) MetLife imposed a "new condition" of a treating provider's opinion that was not required under the governing Plan documents.  Neither argument supports reversal.

A.    MetLife Appropriately Considered Hovan's Occupational Duties

As the District Court recognized, Hovan's argument regarding her alleged inability to perform her occupation is an attempt to shift her burden of proof to MetLife, suggesting that MetLife had to prove she was capable of returning to work. [DE 54 at pp. 13-14.] Rather, it was Hovan's burden to demonstrate that her condition precluded her from performing her occupation after October 16, 2020, when she was discharged from the program at PeakView. [*Id.*]

11

The administrative record of Hovan's claim reveals that MetLife considered her occupational duties when MetLife had a treating provider's opinion as to Hovan's work restrictions and limitations. When treating psychiatrist Dr. Punjwani indicated that Hovan could not work while in PHP treatment, MetLife approved and paid her claim through the date when her treatment concluded. But when no treating provider opined as to Hovan's functional capabilities with regard to the period October 17, 2020 and beyond, **MetLife did not have any recommended restrictions or limitations to compare against her occupational duties.** *Cf. Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 988 (6th Cir. 2010) (acknowledging point of functional capacity evaluation and independent psychological exam was not to determine whether claimant met definition of disability; rather, those exams identified limitations **which were then considered by vocational counselor**).

This case is therefore distinguishable from those which Hovan cites, where information about the claimant's job was unknown or where restrictions and limitations were not rationally compared to occupational duties. *McDonough v. Aetna Life Ins. Co.,* 783 F.3d 374, 380 (1st Cir. 2015) (insurer had no articulation of material duties of occupation as normally performed in national economy); *Miller v. Am. Airlines, Inc.,* 632 F.3d 837, 855 (3d Cir. 2011) (reviewer's conclusion that

claimant could work as pilot, operating under considerable stress, at odds with conclusion that stress put claimant at risk for psychotic episode).

Certainly, being a litigation attorney requires mental acuity, sustained concentration, and the ability to handle occupational stress – counsel in this case and the Court clearly are aware of that.  However, the facts of this case are entirely distinguishable from those that Hovan cited to in the court below[7] because, in the cases Hovan relies upon, treating physicians supported the claimants' inability to perform certain tasks required of a litigation attorney.  Here, Hovan wants the Court to infer that, because she has been diagnosed with bipolar disorder, she cannot work as an attorney.[8]  However, disability under the terms of the Plan at issue is not

---

[7] Specifically, Hovan cited to *Teicher v. Regence Health and Life Ins. Co.,* 562 F. Supp.2d 1128, 1139 (D. Or. 2008) (multiple physicians supported litigator's inability to work); *Dewsnup v. Unum Life Ins. Co. of Am.,* No. 2:17-cv-126, 2018 WL 6478886, *6 (D. Utah, Dec. 10, 2018) (same); and *Rosenthal v. LTD Plan of Epstein, Becker & Greene, P.C.,* No. CV-98-4246, 1999 WL 1567863, *2-3 (C.D. Cal., Dec. 21, 1999) (same). [DE 26 at pp. 4, 13]

[8] For this reason, Hovan's citations to cases in which bipolar disorder has been found disabling or cases in which attorneys with bipolar disorder were found disabled, do not provide the Court with any guidance in this specific case. *E.g., Bauer v. Astrue,* 532 F.3d 606, 609 (7th Cir. 2008) (SSDI claimant who had treating physician support found disabled; her bipolar disorder responded erratically to treatment and she was heavily medicated to cope with ADLs); *Fitts v. Unum Life Ins. Co. of. Am.,* No. 98-617, 2007 WL1334974, *9 (D.D.C. May 7, 2007) (attorney disabled from bipolar disorder with cognitive deficits; he had treating physician support for disability claim and testing supporting intellectual decline).  As even Hovan's own authorities recognize, bipolar disorder can vary in severity and is capable of being treated and managed.  *Applicants v. Tex. State Bd. of Bar Examiners,* No. A-93-CA-740, 1994 WL 923404, *2, *9 (W.D. Tex., Oct. 11, 1994) (in case about alleged

established merely by a medical diagnosis absent proof that the claimant's condition actually precludes her from working. *See Richey v. Hartford Life and Acc. Ins. Co*., 608 F. Supp. 2d 1306, 1310 (M.D. Fla. 2009).

Here, when MetLife asked for a provider's opinion on work functionality, Hovan submitted a form from Dr. Punjwani one month after her discharge from PeakView.  Dr. Punjwani opined that Hovan could not work while she was in PHP treatment through October 16, 2020, but on discharge he noted Hovan was stable and her condition was much improved.[9] According to Dr. Punjwani, she had logical thought process, clear and goal-directed association with no evidence of a formal thought disorder, appropriate affect, and euthymic mood. She was alert, awake, and oriented to person/place/time/event. She denied suicidal ideation, homicidal

---

ADA violation arising from Texas Bar inquiry into mental health history, acknowledging that an applicant with bipolar disorder would trigger investigation but not be automatically denied license to practice law); https://www.nimh.nih.gov/health/topics/bipolar-disorder (overview and diagnosis sections: "[f]ollowing a prescribed treatment plan can help people manage their symptoms and improve their quality of life" and "[r]eceiving the right diagnosis and treatment can help people with bipolar disorder lead healthy and active lives") (visited 5/22/23).

[9] Importantly, the opinion of a treating psychiatrist such as Dr. Punjwani on the day of discharge from a treatment program is not merely a snapshot of a random day in Hovan's life like the cases cited by Hovan. [IB at p. 25 (citing *Samuels v. Acting Com'r of Social Security*, 959 F.3d 1042, 1046 (11th Cir. 2020); *Lewis v. Colvin*, No. 14-cv-50195, 2016 WL 4530338, *5 (N.D. Ill. Aug. 30, 2016)).] Rather, that was a day on which Dr. Punjwani opined that Hovan was stable and could be discharged from the more intensive partial hospitalization treatment.

ideation, self-injurious behavior, visual hallucinations or auditory hallucinations. She had improved insight and judgment, good reliability, intact recent/remote memory, intact language, and normal attention/concentration. These were the types of improvements Hovan's initial psychiatrist (Dr. Lara) indicated would allow Hovan to return to work. Dr. Lara never said that Hovan had to be symptom-free; rather, he opined that she could return to work when her symptoms were well-controlled.

Hovan cites to Dr. Punjwani's statement that Hovan's functionality was significantly affected. [IB at p. 7] However, that statement must be evaluated in the context of the form he completed. With respect to *work functionality*, Dr. Punjwani opined that her "*impairment affects but does not preclude ability to function*." Even during her period of day treatment at PeakView, Dr. Punjwani indicated Hovan had no restrictions or limitations in the following activities of daily living: driving, making decisions regarding finances or legal matters, completing household chores/tasks, shopping, attending school, travel out of state, and "other."

In making her argument, Hovan is asking that MetLife engage in guesswork (to guess that she cannot work as an attorney based solely on a diagnosis, or to guess that her decision not to take 25 mg of Zoloft was indicative of poor judgment). Neither MetLife nor this Court can assume that Hovan's condition was incapable of treatment, or that her decision to pursue Ketamine injections instead of Zoloft was

15

an irrational choice.[10]   It was not MetLife's burden to demonstrate Hovan's continued disability, and for MetLife to have guessed as to Hovan's functionality for the period October 17, 2020 and beyond would have been the antithesis of a reasoned determination.  *McDonough,* 783 F.3d at 381 ("a determination based on guesswork is the antithesis of a reasoned determination").  MetLife's determination based on the information before it was both correct and reasonable, and must be upheld.

    B.   <u>MetLife Did Not Import a "New Condition" for Eligibility into the Plan</u>

Hovan next contends that MetLife imposed a "new condition" not required by the Plan – specifically, that a treating provider's opinion be submitted as a condition of benefits. [IB at pp. 21, 23] But Hovan acknowledges that the Plan requires "proof," defined as evidence that the claimant "has satisfied the conditions and requirements" for the benefits claimed. [*Id.* at p. 23] She further acknowledges that a condition and requirement for benefits is "continuing Disability," with "Disability" defined as "inability, due to sickness or injury, to perform the material duties of his or her own occupation."  [*Id.*]

---

[10] Dr. Punjwani reported her prognosis on discharge to be good. And Hovan's own records demonstrate that – following a period of medication and treatment – she functioned well without medication for 12 years. During that period of time from 2007 to early 2019, she went to and graduated from law school, worked as a lawyer, and was a single mother.

Certainly, where treatment records provide evidence of the inability to perform one's occupation, a claim administrator can make a determination of disability without further information from a treating provider. But if the records do not contain such evidence, requiring evidence of the inability to perform one's occupation is not importing an additional requirement into the Plan. [*Cf. id.* at p. 22 (citing distinguishable cases of *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala.*, 41 F.3d 1476, 1484 (11th Cir. 1995) (administrator used different definition of medical necessity than that found in plan) and *Saffle v. Sierra Pacific Power Co. Bargaining Unit LTD Plan*, 85 F.3d 455, 459-60 (9th Cir. 1996) (administrator modified definition of disability to include requirement that claimant could not work with accommodations)).] Instead, requiring such evidence is just upholding the Plan's proof requirements.

That is the situation here. Therapist Stevens is the only provider who saw Hovan after the PHP treatment, but did not discuss occupational functioning in her treatment notes. Hovan, who was represented by counsel throughout her entire claim, never provided any statement by Stevens in support of her claim or a completed behavioral assessment form by Stevens. MetLife informed Hovan in the denial letter of the information necessary for appeal, but the only new records provided were more treatment notes by Therapist Stevens (who did not comment on functionality). During the administrative appeal process, MetLife gave Hovan

17

the opportunity to have her treating providers respond to Dr. Ghebrendrias'

independent physician consultant review. Although Hovan's counsel initially

requested an extension to do so, which MetLife readily granted, no treating

providers responded to the independent physician consultant's review.

Ultimately, where Hovan's treatment records did not comment on work

functionality, it was both reasonable and correct for MetLife to rely on the opinion

of a board-certified psychiatrist (Dr. Ghebrendrias) who reviewed those records and

concluded that Hovan did not have restrictions or limitations after her discharge from

PeakView.

II.    ALTERNATIVELY, THIS COURT SHOULD AFFIRM THE
       DISTRICT COURT'S RULING BECAUSE METLIFE'S BENEFITS
       DETERMINATION WAS NOT ARBITRARY AND CAPRICIOUS.

Even if this Court were to disagree with the District Court's analysis under

the first *Blankenship* step, the Court must continue its analysis with steps 2-6.

*Blankenship*, 644 F.3d at 1355. As explained below, this Court should affirm the

District Court's ruling under this further analysis.

A.    MetLife's Decision Was, At a Minimum, Reasonable

The parties agree that the Plan affords discretion to MetLife in the review of

claims, so the Court must next focus on whether reasonable grounds supported

MetLife's decision under the more deferential arbitrary and capricious standard of

review. [DE 28 ¶2]; *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1564 (11th Cir. 1990) (a "wrong" decision is nevertheless entitled to deference so long as it was not "completely unreasonable" due to the Plan's grant of discretion), *overruled on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L.Ed.2d 299 (2008); *see also Callough v. E.I. Du Pont De Nemours & Co.*, 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996) ("[A]n abuse of discretion or arbitrary and capricious standard means that the reviewing court will affirm merely if the administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker.").

This Court is "limited to determining whether [the administrator's claims decision] was made rationally and in good faith – not whether it was right." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 825 (11th Cir. 1984). As emphasized by the United States Supreme Court in *Conkright v. Frommert*, 559 U.S. 506, 517 (2010), deference to ERISA administrators promotes efficiency and uniformity by encouraging resolution of benefits through internal administrative proceedings as opposed to costly litigation. In other words, courts applying an arbitrary and capricious standard of review continue to encourage deference to administrators like MetLife particularly where those administrators engaged, as MetLife did, in a

19

thorough, comprehensive process of analyzing the claim and reaching conclusions that are, at the very least, reasonable.

Hovan's primary contention on this issue is that MetLife's decision was arbitrary and capricious due to (1) MetLife not examining her, and (2) an allegedly "self-serving" review of Hovan's records. As discussed below, neither contention is supported.

### 1. MetLife Reasonably Relied on a Medical Records Review

First, there is no Plan or ERISA requirement that MetLife must examine a participant who claims disability. *See, e.g., Blankenship*, 644 F.3d at 1357 (rejecting argument that insurer's "use of 'file' reviews by its independent doctors – instead of live, physical examinations of [claimant] – counted as evidence that [insurer] acted arbitrarily and capriciously, particularly in the absence of other troubling evidence"). In fact, such a requirement would run counter to the Supreme Court's holding in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (a treating physician's opinion is not entitled to any special deference under ERISA). For this reason, many courts have rejected arguments like Hovan's which try to impose an examination requirement, even in cases involving psychiatric claims. *Diaz v. Liberty Life Assur. Co. of Bos.*, No. CV 17-20662-CIV, 2017 WL 3822742 at *10 (S.D. Fla. Aug. 30, 2017) (no different rule in Eleventh Circuit for weight given to review by consulting psychiatrist); *Island View Residential Treatment Ctr., Inc. v. Bluecross*

*Blueshield of Mass., Inc.*, No. 07–10581–DPW, 2007 WL 4589335 (D. Mass. Dec. 28, 2007) (noting that *Nord* does not recognize such an exception as appropriate); *Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580 (10th Cir. 2019) (rejecting argument questioning credibility of file reviews in case involving psychiatric impairment).]  None of the cases cited by Hovan for this argument are cases from the Eleventh Circuit or its district courts. [IB at p. 26] Rather, courts in this Circuit have upheld the reliance "on the opinion of a qualified medical consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records" in cases involving mental health issues. *Diaz*, 2017 WL 3822742 at *10 (collecting cases where courts upheld decisions based on opinions of consulting psychiatrists and/or psychologists); *Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1349-51 (M.D. Fla. 2004) (decision based in part on psychological review).

This is true even when a claimant volunteers to undergo an in-person examination.  Moreover, in this case, Hovan's offers to undergo examinations were made at times that are simply irrelevant.  Hovan first volunteered to undergo an in-person examination in June 2020, when she was having difficulty gathering proof of disability from her treating provider. MetLife continued paying her benefits despite that issue due to regulations in place at the beginning of the pandemic. Later, in July 2021 when Hovan appealed MetLife's determination, she contended that MetLife

should have an in-person examination. However, an in-person examination at that time would not have provided insight as to Hovan's ability to work as of October 17, 2020, which both parties agree is the relevant inquiry.

Because no treating physician provided support for work restrictions and limitations after October 16, 2020, this case is similar to *Bates v. Metro. Life Ins. Co.*, No. CIV.A. 5:08-CV-22CAR, 2009 WL 2355834 (M.D. Ga. July 27, 2009), where the district court agreed with MetLife's consulting psychiatrist that the record did not support a finding of depression so severe that the plaintiff could no longer work. *Id.* at *14 (plaintiff's treating primary care provider's and psychiatrist's records were of "little assistance" in establishing plaintiff's depression impeded her ability to work because they contained no discussion about the severity of any limitation caused by the depression). Specifically, the Court noted:

> [W]hile Plaintiff possibly suffers from depression, the extent of the limitations imposed by this condition is simply not clear. The record did not: include a detailed description of intensity, frequency, and duration of Plaintiff's symptoms; suggest that she may suffer from more severe psychiatric symptoms; provide objective information such as detailed mental status examination or psychological testing; or document more severe observed signs of psychiatric illness such as disorganized thought, impaired perception of reality, major cognitive deficits, slowed or agitated behavior, disturbed speech with communication or poor hygiene, which may more reliably reflect impairment. *Most importantly, [Plaintiff's treating psychiatrist] did not specifically opine why Plaintiff's reported psychiatric symptoms would prevent her from working*, other than note that Plaintiff complained that her ability to concentrate was impaired.

22

*Id.* (emphasis added)*; see also Howard v. Hartford Life & Acc. Ins. Co*., 929 F. Supp. 2d 1264, 1294 (M.D. Fla. 2013), *aff'd* 563 F. App'x 658 (11th Cir. 2014) (finding it was reasonable for administrator to give less weight to the opinions of the plaintiff's treating physicians where their records did not actually confirm any functional limitations in the plaintiff's ability to perform her occupation).

For these reasons, MetLife properly relied on the opinion of the independent physician consultant, board-certified psychiatrist Dr. Ghebrendrias, based on her records review and without examination of Hovan.

### 2. *The Medical Records Review Relied Upon by MetLife Was Rationally Made and Based on the Available Evidence*

Hovan next accuses MetLife of a "self-serving" records review. It is Hovan, however, who engages in a self-serving review. She refers to prior suicide attempts, without referencing that they were in 2005, or that her last episode of active suicidal ideation was at the time of her second divorce in 2015.[11] She refers to statements made in her therapy sessions about passive suicidal ideation, feeling manic, wanting to leave town in her RV when her son advised he wanted to go live with his father, or feeling like meditating had healed her depression. But these are statements made by a patient and recorded by a therapist who never opined that Hovan had any

---

[11] There is, of course, a difference between passive suicidal ideation (thoughts of not wanting to live) and active suicidal ideation (with intent or a plan).

23

occupational restrictions or limitations. The statements Hovan relies upon are contained in Therapist Stevens' intake questionnaire, or in "subjective" or client symptom rating portions of her progress notes. In contrast, in the "observations" part of her notes, at every single office visit Therapist Stevens reported that Hovan's cognitive functioning was "oriented/alert," her affect was "appropriate," her "interpersonal" was "interactive," and her functional status was "intact." The only observation which fluctuated during Stevens' treatment of Hovan was her mood. Hovan's subjective statements are now being extracted from medical records by counsel to argue that reported symptoms equate to the inability to perform the occupation of litigation attorney. However, it is reasonable for MetLife to require more than just Hovan's own description of her symptoms. *See Hufford*, 322 F. Supp. 2d at 1356 (if plan did not require proof of disability beyond self-report, "LTD benefits would be payable to any participant with subjective and effervescent symptomatology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional").

Simply put, MetLife did the opposite of a self-serving medical records review. It provided Hovan's records to an independent physician consultant – one chosen by its vendor, Genex. That physician was Dr. Ghebrendrias, who has gone to medical school for psychiatry and attained board certification. Dr. Ghebrendrias reviewed

Hovan's records and considered both her self-reported symptoms and her treaters' clinical observations.

Importantly, Dr. Ghebrendrias acknowledged Hovan's diagnoses, was aware that she had stopped taking the small 25 mg dosage of Zoloft prescribed by the PeakView psychiatrist, and was aware of her chronic passive suicidal ideation without plan or intent. Contrary to Hovan's suggestion, [IB at pp. 30-31], Dr. Ghebrendrias noted Hovan's reports of mania and acknowledged that Hovan's mood was abnormal. Nonetheless, Dr. Ghebrendrias concluded restrictions and limitations were not supported, explaining:

> The claimant has a documented history of anxiety, *manic*, depressive, and post-traumatic symptoms. … Measurable exams indicated that the claimant had *abnormal mood*, but otherwise, her exams were normal.
>
> [T]here is no evidence of findings to suggest limitations in her status. All of the claimant's *measurable exams indicated depressed and anxious mood* but had no evidence of *other abnormalities*. The claimant reported having passive suicidal ideation but never had plan or intent. In addition, the claimant does not have any measurable evidence of psychomotor agitation, psychosis, delusions, hallucinations, lack of motivation, loss of appetite, homicidality, suicidality (intent or plan), self-destructive behaviors, or involuntary hospitalizations due to a psychiatric emergency. The claimant has not required a higher level of care for her psychiatric conditions, and there was no mention of impairment in insight and judgment. …

[DE 22-1 at pp. 542-43 (emphases added)]  In other words, Dr. Ghebrendrias looked at the factors which were indicative to her – as a board-certified psychiatrist – of

Hovan's functional capacity.[12]  This was not a self-serving records review, but rather reliance on the findings of an appropriate expert.

In the absence of any functional restrictions or limitations imposed by Hovan's treating providers after October 16, 2020, MetLife's decision to rely on the opinion of Dr. Ghebrendrias was not "self-serving." Instead, it was a decision rationally made based on the available evidence. This Court must therefore uphold this decision as both reasonable and correct.

B.      MetLife's Decision Was Not Influenced By a Conflict of Interest.

The parties agree that the structural conflict of interest recognized by the Supreme Court in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), exists in this case.  However, this Circuit recently observed that the presence of a structural conflict of interest is "an unremarkable fact in today's marketplace." *Blankenship*,

---

[12] It is not surprising that Dr. Ghebrendrias notes the absence of factors such as lack of suicidality and homicidality, *among others*, when summarizing Hovan's records because these are factors relied upon by mental health providers to assess their patients. *Bates*, 2009 WL 2355834 at *14 (factors such as homicidal or suicidal ideation "would have been indicative of a severe mental illness").  This case is therefore not like *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598 (6th Cir. 2014), relied upon by Hovan. [IB at p. 28]  In *Hayden*, the records review concluded the claimant could have performed *some* full-time job despite lack of severe psychiatric symptoms, which both ignored the issue of whether the claimant could have performed *her* job as well as provider opinions on her inability to function in the workplace. 763 F.3d at 602-03, 607.

644 F.3d at 1356. Accordingly, there must be a sufficient showing that the structural conflict has "inherent or case-specific importance" before the court can overturn an adverse benefit determination. *Id.* (citing *Glenn,* 554 U.S. at 117-18). "[T]he existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Doyle v. Liberty Life Assur. Co. of Bos.*, 542 F.3d 1352, 1360 (11th Cir. 2008).

Contrary to Hovan's argument, little or no weight should be given to the structural conflict here as there is no evidence that it adversely affected MetLife's decision-making. MetLife has already addressed several issues raised by Hovan with regard to an asserted conflict in parts I and II.A of this Brief, *supra*, and will not belabor these points. [*See* part I (MetLife appropriately considered the demands of Hovan's occupation and did not import additional requirement into Plan) & II.A (MetLife reasonably relied on a board-certified psychiatrist's records review).] Suffice it to say, MetLife conducted a thorough review of Hovan's claim, paid her claim for 16.5 of the 24 possible months of benefits, and denied her claim after she failed to meet her burden of demonstrating continued disability.

Hovan raises one more argument in support of the alleged influence of the structural conflict of interest in suggesting that MetLife did not adequately attempt to obtain Therapist Stevens' opinion on Hovan's functionality. [IB at pp. 33-35]

27

Specifically, Hovan suggests that MetLife's effort to reach out to Therapist Stevens consisted only of a Google search for a number and the inability to reach that number due to a rapid busy signal. [*Id.* at p. 34]  Hovan fails to mention that, after the Google name search (which was performed because there was no number in the initial treatment notes provided), MetLife's licensed professional counselor noted the logo "Bridge Over Troubled Waters" on Therapist Stevens' notes. She then confirmed that the Google search number for Therapist Stevens was the same as the number for Bridge Over Troubled Waters, so the number she had been calling was correct and not a random number. Multiple attempts to call the number were made, each resulting in a rapid busy signal. Again, Therapist Stevens' records did not comment on work functionality, and she was not the provider Hovan chose to opine on work functionality.  Moreover, on appeal Dr. Ghebrendrias tried to reach Therapist Stevens months later at the same number, with the same result.  Dr. Ghebrendrias's report reflects exactly that, and the report was shared with Hovan via her counsel for comment. Dr. Ghebrendrias specifically asked Hovan's providers to identify which activity restrictions they would advocate based on observed mental health limitations. Although Hovan initially planned to provide a response to Dr. Ghebrendrias's report, Hovan later chose not to respond. If Hovan had wanted Therapist Stevens to provide her comments on Dr. Ghebrendrias's report or her

opinion on Hovan's restrictions, she had ample opportunity to do so during the administrative claim review process.

This case is therefore nothing like the one Hovan cites in support of a cursory attempt to contact a treating provider. [*Cf.* IB at p. 35 (citing *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 549 (6th Cir. 2015) (administrator giving provider who opined on functionality only 24 hours to respond to peer reviewer's phone call was not reasonable)).] In sum, MetLife's decision based on Dr. Ghebrendrias's report – to which Hovan had the opportunity to have Therapist Stevens respond – was reasonable for the reasons discussed in parts I and II.A of this Brief. Hovan has failed to demonstrate that MetLife's reasonable decision was adversely affected by any conflict.

## CONCLUSION

For the foregoing reasons, MetLife respectfully requests that this Court affirm the judgment below. Alternatively, if the Court were to reverse the judgment below, MetLife asks that this Court remand for the District Court's discretionary determination of the appropriate remedy in the first instance.[13]

Respectfully submitted,

By:    */s/ Jeannine C. Jacobson*
Jeannine C. Jacobson
Maynard Nexsen, PC
9100 S. Dadeland Blvd., Suite 1500
Miami, FL 33156
Telephone: (305) 735-3752

*Counsel for Appellee*

---

[13] *See  Acree v. Hartford Life & Acc. Ins. Co.*, 917 F. Supp. 2d 1296, 1322 (M.D. Ga. 2013).

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, I certify that this brief contains no more than 14,000 words. Based on the word count of the word processing system used to prepare this Brief, the word count, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), is 6,770.

I also certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced font that includes serifs using Microsoft Word, Times New Roman, 14 point.

By:    */s/ Jeannine C. Jacobson*
       Jeannine C. Jacobson

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing brief to be served on counsel for

Appellant via electronic mail generated by the Court's electronic filing system on

this 22nd of November, 2024:

> Jerel C. Dawson
> Alexander A. Palamara
> Gregory M. Dell
> Attorneys Dell & Schaefer Chartered
> 2625 Weston Road
> Weston, Florida 33331
> (954) 620-8300

By:    */s/ Jeannine C. Jacobson*
       Jeannine C. Jacobson

32